COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-00254-CV

IN THE INTEREST OF C.S.C., A CHILD 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Jennifer Thomas appeals the trial court’s order terminating her parental rights to her daughter C.S.C.
(footnote: 2)  In her first two issues, Jennifer complains that the evidence is legally and factually insufficient to support the trial court’s findings that termination was in C.S.C.’s best interest and that she endangered the physical or emotional-well being of C.S.C.  We will affirm.

II.  Factual and Procedural Background

A. Events Prior to C.S.C.’s Birth

C.S.C. was immediately taken into the custody of the Texas Department of Family and Protective Services (TDFPS) when she was born on July 14, 2005.  Consequently, we begin our recitation of the facts with events that occurred during Jennifer’s pregnancy with C.S.C.  C.S.C.’s father described Jennifer as having a bad temper and testified that while he and Jennifer were living together, she pushed him and threw wood through windows at their apartment because she was mad. 

Officer Howze of the Fort Worth Police Department testified that on April 12, 2005, he investigated a domestic disturbance at Jennifer’s apartment.  He noted that almost every window of the apartment had been broken out, that interior doors had been damaged, and that a fire apparently had occurred when a pizza box was placed on the stove.  Officer Howze’s investigation revealed that Jennifer and her live-in boyfriend (C.S.C.’s father) had argued.  Jennifer’s boyfriend had pushed her, grabbed her around the neck, and then left the scene when Jennifer called the police.  Jennifer told Officer Howze that she had damaged the apartment’s windows and doors because she became angry. Officer Howze reported that Jennifer was thirteen at the time of this incident and that she was five months’ pregnant with her boyfriend’s child. 

A few days later on April 15, 2005, Officer William J. Bench of the Fort Worth Police Department encountered Jennifer in an ambulance where she was being treated for cuts to her hand and arm.  Officer Bench learned that Jennifer had cut her hand when she punched a window because she was mad.  While Officer Bench was with Jennifer, she talked about killing her baby because she did not like it; she said that she would rather kill her baby than let it “live like this” and mentioned that she would “throw it in the trash can like the other – other baby [she] had.”  

Because of Jennifer’s age, she could be released only to an adult.  Officer Bench therefore contacted CPS, so CPS could become Jennifer’s legal guardian, and took Jennifer to the hospital for a mental health evaluation.  Officer Bench testified that on the way to the hospital, Jennifer became “hyper violent”—kicking the windows, screaming, flailing her arms, and attacking anybody who opened the squad car door, including him—and had to be tied down in the back seat in order to be transported.  Officer Bench said that Jennifer had acknowledged that she was pregnant but did not show any concern that her violent actions might injure the child she was carrying.  

When they arrived at the hospital, Jennifer refused an ob/gyn exam and denied being pregnant.  Jennifer again became “hyper violent” in the psychiatric ward and had to be restrained.  Officer Bench described Jennifer as “uncooperative” from the very beginning of the investigation and “angry at her pregnancy.”   

That same evening, because Jennifer could not provide the names of any adults willing to come pick her up, Lewis Thomas with CPS began an investigation of the neglectful supervision of Jennifer.  Jennifer told Thomas that she had “divorced herself” from her parents and indicated that she was not going to cooperate with CPS.  Although Thomas attempted to get information from Jennifer regarding where she might be placed, Jennifer was very uncooperative.  Jennifer told Thomas that she did not want to live in this life, that she did not want her baby, that she did not want her baby to have any kind of life like this (i.e., living on the streets), and that she ought to just throw her baby in a dumpster.  Thomas testified that Jennifer did not have any interest in her child, that she had no concern for her prenatal health or for the health of her child, and that she did not demonstrate an ability to care for her child.  Thomas further testified that Jennifer has bipolar disorder. 

Tara Bidwell testified that she works at TDFPS and that it was her job to find a placement for Jennifer.  Bidwell found a facility for temporary placement in Austin and transported Jennifer there in a rental car.  Bidwell testified that after they arrived at the facility and were speaking with the caseworker, Jennifer said, “[S]hut up, Bitch” and hit the caseworker across the face with a notebook.  Bidwell said that Jennifer had an anger problem.

After hitting the caseworker, Jennifer went outside where she proceeded to break the rear windshield wiper from the rental car and used it to hit the car. Jennifer broke the windshield wipers on the front of the rental car, the mirrors, and the tailgate light.  Jennifer then walked away from the facility, and the facility called the Austin Police Department, who apprehended her.  Charges were filed against Jennifer, and then she was transported to the hospital because she was complaining of cramps.  Bidwell testified that she did not find Jennifer’s behavior appropriate, especially for a person who would soon be responsible for rearing a child. 

Jennifer gave birth to C.S.C. on July 14, 2005.  Jennifer was allowed to hold C.S.C. for approximately thirty minutes.  Afterwards, a TDFPS investigator, Kimberly Bailey, left with C.S.C. and placed her with the Hewitts, who have a dual licensed foster home.  Bailey stated that before C.S.C. was born, TDFPS made the decision that C.S.C. would be placed in foster care based on Jennifer’s behavior prior to C.S.C.’s birth.  Bailey explained that Jennifer, while pregnant, had refused to eat, had hit herself in the stomach, and had made comments about harming herself and the baby. 

B. Events After C.S.C.’s Birth

After C.S.C. was born, CPS placed Jennifer in a residential treatment center in Lubbock.  Bailey testified that Jennifer was very physically aggressive, verbally aggressive, assaultive, and suicidal.  Bailey stated that Jennifer has bipolar disorder and conduct disorder. 

In September 2005, TDFPS placed C.S.C. with Jennifer’s aunt.  Before C.S.C. was placed with the aunt, she was fine; when she was removed approximately two weeks later due to allegations of neglect, C.S.C. had severe diaper rash, blistering to her bottom, thrush, and weight loss.  TDFPS returned C.S.C. to her original foster home, where she thrived. 

In November 2005, Detective Darrin McMichael responded to a dispatch at Millwood Hospital, where Jennifer had been assigned to undergo an evaluation.  Detective McMichael reported that Jennifer had decided that she needed medication and thought that the Millwood staff was not getting it for her quickly enough, so she became very violent and had to be moved to another location where she was more secluded.  There, Jennifer jumped off the bed and attacked one of the hospital’s technicians, Barbara Becker.  Jennifer grabbed Becker’s hair and pulled out a large clump, leaving a bald spot the size of a golf ball on the back of Becker’s scalp.  Detective McMichael testified that he pursued assault charges against Jennifer. 

Elizabeth Brook Knox testified that she is employed by MHMR and Tarrant County Juvenile Services and that she was sent to do a mental health screening on Jennifer.  When Jennifer had arrived in juvenile detention, she had claimed that she was having hallucinations.  Jennifer later claimed that she was not having hallucinations but that she did intend to harm herself and asked to be transported to the hospital.  Jennifer explained that she wanted to kill herself, that she had tried to hang herself the day before, and that she would try again if she was not taken to the hospital.  But Jennifer then changed her explanation and said that she did not really want to harm herself; instead, she just wanted to see her boyfriend, whom she believed she would be able to see if she went to the hospital.  

During Knox’s screening, Jennifer was initially calm and pleasant.  However, when Jennifer realized that she would be required to wear a “green suit” at the detention center, Jennifer asked Knox to call her CPS case worker.  Knox could tell that Jennifer, who was handcuffed, was becoming agitated.  Jennifer asked Knox to leave and said that she felt like she was going to attack Knox.  But Knox was unable to get out of the holding cell immediately and felt her hair being pulled hard from behind.  Jennifer pulled Knox down to the ground, and Knox knocked over a chair.  Jennifer held Knox there until a staff member entered and intervened.  Knox testified that she was in fear for her life and that she had bruising and pain in her head for about a week.  Knox further testified that Jennifer is dangerous and that Jennifer did not show remorse for the assault.  Thereafter, Jennifer was adjudicated delinquent of assault and committed to the Texas Youth Commission (TYC). 

Jason Kerr, who has been Jennifer’s caseworker at TYC since March 21, 2006, testified that he monitors Jennifer’s progress in the resocialization program.  Kerr testified that Jennifer participates in academics, behavioral, and correctional therapy and that she is in phase three in both academics and behavioral therapy, with phase four being the highest level that she can achieve.  Kerr said that Jennifer is on phase one in correctional therapy; to get to phase two, she must present her life story, and to get to phase three, she must go through the seven-step process called the offense cycle.  He stated that Jennifer’s primary goal is to be referred to the WINGS program for mothers and children, but she must be a level three or greater in all three therapies to get into the program.  Kerr testified that Jennifer has followed the main rules of TYC; however, she has had some minor violations or “disruption[s] of program”—talking without permission and not following staff instructions—and a major violation—threatening a peer.  Kerr said that Jennifer has had no physical altercations at TYC and that she has demonstrated the ability to control her behavior since coming to his unit.  Kerr stated that Jennifer is receiving treatment for anger management, but she is not currently attending any parenting classes.  He believes that Jennifer’s child motivates her to change her behavior; however, on cross-examination, he admitted that he has only known Jennifer for two months.  

C. Compliance with Service Plan

Bailey testified that the service plan for Jennifer required her to complete parenting classes and a psychological evaluation, maintain appropriate housing, obtain employment, and maintain regular contact with C.S.C.  Bailey testified that Jennifer has begun or participated in parenting classes and that she has completed the psychological evaluation.  With regard to housing, Jennifer went from the initial placement in Austin to detention, then to a shelter, then to a psychiatric hospital, and then to a state hospital; from there she went to detention, and from there to TYC, where she has been since January 2006.  However, Bailey testified that Jennifer satisfied the requirement of maintaining housing free of hazards by remaining in the custody of TDFPS.  Bailey stated that Jennifer does not have a job and must demonstrate that she will be able to provide for C.S.C.’s needs.  

Bailey said that Jennifer’s contact with C.S.C. is limited, but that Jennifer has had two supervised visits.  Bailey said that the initial one-hour visit went fine and that Jennifer was very caring and very appropriate with C.S.C.  However, during the second visit, which lasted two hours, Jennifer did not appear to have a good understanding of the things that a child C.S.C.’s age was capable of doing.  Jennifer thought that C.S.C., although only nine months old, should be able to walk and should not be on formula.
(footnote: 3)  Thus, although Jennifer demonstrated an interest in the well-being of C.S.C. and would call and ask her caseworker how C.S.C. was doing, Jennifer has spent only three and a half hours total with C.S.C. since the child’s birth.  Bailey testified that although TDFPS could have done a monitored return of C.S.C., it chose not to because Jennifer’s mental health care providers indicated that Jennifer’s behavior was unpredictable.  Consequently, TDFPS was unsure whether Jennifer would harm C.S.C.  Because Jennifer had not demonstrated any ability to provide for the safety and needs of C.S.C. on a daily basis, had not demonstrated an ability to provide a safe environment for C.S.C., and had not demonstrated an ability to provide any type of financial support for C.S.C.’s daily needs, it was Bailey’s testimony at trial that Jennifer had not completed her service plan to TDFPS’s satisfaction. 

Bailey testified that she would not say that Jennifer’s placements in hospitals and detention centers had affected her ability to complete her service plan; instead, Bailey said that Jennifer has made choices that have resulted in her not being able to complete her service plan.  For instance, Bailey stated that Jennifer had engaged in assaultive behavior toward a number of people and had been both physically and verbally aggressive.  Even though Jennifer was concerned about C.S.C.’s well-being, Jennifer was not able to manage her own behavior.  Thus, in Bailey’s opinion, Jennifer’s behavior had gotten worse.  

Based on Jennifer’s lack of compliance with the service plan and her unpredictable anger issues, Bailey stated that termination is in C.S.C.’s best interest because Jennifer had continued to engage in behavior that is endangering to C.S.C.  Bailey testified that TDFPS’s plan for C.S.C. is adoption by her foster parents.  Bailey said that C.S.C. has been with her foster family, the Hewitts, since July 16, 2005 and has bonded with the family.  Bailey further testified that the Hewitts want to adopt C.S.C. and that Bailey feels this is an ideal placement for C.S.C. 

D. CASA Advocate’s Recommendation

Penny Chandler, a CASA advocate for C.S.C., testified that C.S.C. is doing very well and is on target for her age and development.  Based on her involvement with the case, she recommended terminating Jennifer’s parental rights.  She testified that C.S.C. has bonded with her foster family and that the Hewitt family would be an appropriate placement for C.S.C.  

E. Disposition

After hearing the above evidence, the trial court entered an order terminating Jennifer’s parental rights.  This appeal followed.

III.  Burden of Proof and Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, TDFPS must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001 (Vernon Supp. 2006);
 In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
see also
 
Tex. Fam. Code Ann.
 § 161.001.

The higher burden of proof in termination cases alters the appellate standard for both legal and factual sufficiency reviews.  
In re J.F.C., 
96 S.W.3d 256, 265 (Tex. 2002); 
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).  Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the matter on which TDFPS bears the burden of proof.  
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  

Accordingly, in reviewing the evidence for legal sufficiency in parental termination cases, w
e “look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.”  
J.F.C.
, 96 S.W.3d at 266.  
In conducting our review, we must disregard all evidence that a reasonable trier of fact could have disbelieved; however,
 we must consider undisputed evidence even if it does not support the finding.  
Id.
  That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not.  
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).  If, after conducting our review, we determine that no reasonable trier of fact could have formed a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient.  
J.F.C.
, 96 S.W.3d at 266.

In determining a factual sufficiency issue, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child’s best interest.  
Tex. Fam. Code Ann.
 § 161.001; 
C.H.
, 89 S.W.3d at 25.  In reviewing the factual sufficiency of the evidence, we must consider all the evidence in the record, both that in support of and contrary to the trial court’s findings.  
C.H.
, 89 S.W.3d at 27-29. Additionally, we must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding.  
J.F.C.
, 96 S.W.3d at 266.  If the disputed evidence is of such magnitude that a trier of fact could not reasonably have formed a firm belief or conviction that its finding was true, then the evidence is factually insufficient.  
Id
. 

IV.  Legally and Factually Sufficient Evidence Regarding Endangering Course of Conduct

In her second issue, Jennifer argues that the evidence is legally and factually insufficient to establish the grounds for termination under section 161.001(1)(E).  TDFPS argues that there is ample evidence to support the trial court’s endangerment finding based on Jennifer’s conduct. 

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child’s physical or emotional well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125
;
 
see
 Tex. Fam. Code Ann. 

§ 161.001(1)(E).  Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996). 
  Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125
;
 
see
 Tex. Fam. Code Ann. 

§ 161.001(1)(E).  

However, it is not necessary that the parent’s conduct be directed at the child or that the child actually suffer injury. 
 Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the child’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct both before and after the child’s birth.  
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of a child.
  See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent.
  See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, and 
C.H.
, 89 S.W.3d at 17. 

The record demonstrates that Jennifer often lacked emotional stability and that her behavior was unpredictable.  Jennifer has bipolar disorder and a conduct disorder.  Consequently, Jennifer was suicidal at times and had tried to hang herself after C.S.C. was born. 

The record reveals a pattern of uncontrolled anger that often resulted in Jennifer inflicting physical harm upon herself, both before and after she was pregnant, and others.  C.S.C.’s father testified that Jennifer pushed him during an argument and that she had a bad temper.  A few days later, Jennifer cut her hand when she punched a window.  Also during her pregnancy, Jennifer refused to eat, hit herself in the stomach, and became “hyper violent”—kicking the windows, screaming, and flailing her arms—when she was transported to the hospital.  Jennifer was also the recipient of abuse from C.S.C.’s father, her live-in boyfriend; he pushed her, grabbed her, and hit her while she was pregnant.  

Concerning her conduct with regard to others, Jennifer attacked the officers who opened the squad car door during one of her “hyper violent” episodes.  Jennifer cursed at and hit her caseworker in Austin with a notebook, threw a windshield wiper at the person who transported her to Austin, attacked a medical technician and pulled out her hair, and attacked and pulled to the ground the woman who was sent to perform a mental health screening.  Moreover, people who dealt with Jennifer described her as physically aggressive, verbally aggressive, and assaultive. 

The record also reveals that Jennifer’s uncontrolled anger often led her to damage property.  During one of her rages, Jennifer destroyed an apartment by breaking all of the apartment’s windows and damaging the apartment’s interior doors.  During another rage, Jennifer damaged a rental car by tearing off the rear windshield wiper and breaking the front windshield wipers, the mirrors, and the tailgate light. 

The evidence also demonstrates that Jennifer made threats about harming herself and her unborn child.  Specifically, Jennifer talked about killing her baby because she did not like it and stated that she would “throw it in the trash can like the other – other baby [she] had.”  Jennifer also said that she did not want to live in this life.  Jennifer threatened a peer while she was at TYC and also mentioned that she wanted to spank C.S.C. for twisting and turning her head while getting her nose wiped at nine months of age.  

Although Jennifer admits that her statements about C.S.C. are alarming, she argues that there is no evidence that she intended to act on any of these threats to harm C.S.C.  However, the evidence documented above—that Jennifer refused to eat, hit herself in the stomach, and engaged in assaultive behavior towards others that could have endangered the baby— refutes Jennifer’s argument.

Jennifer also contends that because she never has had custody of C.S.C., there is no evidence that she engaged in conduct which directly endangered C.S.C.’s physical or emotional well-being.  However, endangering acts need not be directed at the child or cause actual injury or threat of injury to the child, and 
as mentioned above, endangerment may include what a parent does both before and after the birth of a child.  
In re U.P.
, 105 S.W.3d 222, 233-34 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); 
see also D.M.
, 58 S.W.3d at 812.

We have carefully reviewed the entire record.  Looking at all the evidence in the light most favorable to the trial court’s finding, giving due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that 
Jennifer engaged in conduct that endangered C.S.C.’s physical or emotional well-being.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(E); 
In re S.F.
, 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no pet.) (holding that criminal behavior before child’s birth, coupled with misbehavior during imprisonment, provided sufficient basis to establish course of conduct that endangered child).
  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s finding on endangerment.  We overrule Jennifer’s second issue.

Jennifer also challenges the legal and factual sufficiency of two other statutory grounds for termination that were alleged by TDFPS but not found by the trial court:  that Jennifer constructively abandoned C.S.C. and that Jennifer executed an unrevoked or irrevocable affidavit of relinquishment of parental rights.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(K), (N). 
 TDFPS concedes that there is no evidence to support these two grounds.  
Only one finding under section 161.001(1) is necessary, however, to support a judgment of termination.
  Tex. Fam. Code Ann.
 § 161.001(1); 
In re J.J.O.
, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.); 
see also Tex. Dep’t of Human Servs. v. E.B.
, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh’g).  Accordingly, because we have held that legally and factually sufficient evidence exists to support the trial court’s finding under family code section 161.001(1)(E), we need not address Jennifer’s third and fourth issues.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(K), (N); 
Tex. R. App. P.
 47.1; 
J.J.O.
, 131 S.W.3d at 630.

V.  Termination Was In C.S.C.’s Best Interest

In her first issue, Jennifer argues that the evidence is legally and factually insufficient to support the trial court’s finding that termination of her parental rights was in C.S.C.’s best interest.  TDFPS argues that there is ample evidence to support the trial court’s “best interest” finding.
 

A strong presumption exists that the best interest of a child is served by maintaining the custody of a parent.  
In re W.E.C.
, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.).  The fact-finder may consider a number of factors in determining the best interest of the child, including the following:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H.
, 89 S.W.3d at 27.

C.S.C. was only ten months old at the time of trial and was unable to express her desires.  However, testimony from Bailey and Chandler revealed that C.S.C. is bonded with her foster family.  Mr. Hewitt, C.S.C.’s foster father, testified that C.S.C. does not know anyone other than the Hewitts as family.  Moreover, the record revealed that Jennifer has spent a total of only three and a half hours with C.S.C. since her birth; thus, C.S.C. is not bonded with Jennifer.  

The record did not reveal that C.S.C. had any special physical and emotional needs.  Instead, the evidence demonstrated that C.S.C. is doing very well and is at least on target if not ahead of target for her age and development.  Mr. Hewitt testified that his family is willing to continue to provide for C.S.C.’s emotional and physical needs.

The endangering course of conduct discussion above addressed the present and future physical and emotional dangers to C.S.C., as well as Jennifer’s parenting abilities, or lack thereof, and her acts and omissions.  Jennifer’s unpredictable and often violent behavior resulted in physical harm to herself and in her being adjudicated a juvenile delinquent for destruction of property and assaults and threats against others.  Although Jennifer argues that she was unable to complete her service plan to TDFPS’s satisfaction because TDFPS “shuttled [her] from place to place with absolutely no continuity or stability,”  Jennifer’s own actions caused her changes in living arrangements and caused her to be put in hospitals and detention centers where she was unable to parent C.S.C. and was unable to visit with C.S.C. very often.  Moreover, the visits that Jennifer did have with C.S.C. showed that she lacked knowledge of C.S.C.’s development and that she lacked an understanding of what discipline, if any, is appropriate in different circumstances.  Therefore, TDFPS’s plan for C.S.C. included terminating Jennifer’s parental rights and placing her for adoption with her foster parents, which would provide a safe environment and permanency.

Looking at all of the evidence in the light most favorable to the best-interest finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.
  See J.F.C.
, 96 S.W.3d at 266; 
J.T.G.
, 121 S.W.3d at 124-25.  Additionally, giving due consideration to evidence that the fact-finder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Jennifer’s parental rights would be in C.S.C.’s best interest.  
See In re S.M.L.
, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father’s parental rights was in child’s best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s best-interest finding.  We overrule Jennifer’s first issue.

VI.  Conclusion

Having overruled Jennifer’s first and second issues, we affirm the trial court’s order terminating Jennifer’s parental rights to C.S.C.

SUE WALKER

JUSTICE

PANEL F:  CAYCE, C.J.; WALKER and MCCOY, JJ.

DELIVERED:  November 30, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The trial court also terminated the parental rights of C.S.C.’s father, but he did not appeal. 

3:
Paulette Owens-Flowers, who is employed with CPS, observed this visit and testified that Jennifer let go of nine-month-old C.S.C. to see if she could walk even though Jennifer had been told that C.S.C. could not walk.  Owens-Flowers also testified that Jennifer wanted to spank C.S.C. for twisting and turning her head while getting her nose wiped.  Based on her observations, Owens-Flowers stated that she does not feel that Jennifer has the ability to discipline or train C.S.C.